

**U.S. Department of Justice**

United States Attorney

*District of Columbia*

---

Judiciary Center
555 Fourth St. N.W.
Washington, D.C. 20001

March 9, 2006

**FILED**

**MAR 1 0 2006**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

By US Mail and Fax
Tony Miles, Esq.
Federal Public Defender for the District of Columbia
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
Fax: 202-208-7515

   Re: <u>United States v. Jerome Joseph</u>, 05-410 (CKK)
     Next Date: Hearing March 10, 2006

Dear Mr. Miles:

  This letter sets forth the plea agreement this Office is willing to enter into with your client, Jerome Joseph. The offer expires on and must entered in court on or before **Friday, March 10, 2006**. If your client accepts the terms and conditions of this offer, please have your client execute this document in the space provided below and return it to me. Upon our receipt of the executed document, this letter will become the plea agreement. The terms of the agreement are as follows:

  1. **Charges**. Your client agrees to admit guilt and enter a plea of guilty to Count One of the Indictment in this case in which your client is charged with Hostage Taking, in violation of Title 18, United States Code, Section 1203. It is understood that the guilty plea will be based on a factual admission of guilt to the offenses charged and will be entered in accordance with Rule 11 of the Federal Rules of Criminal Procedure. The attached "Statement of the Offenses," Attachment A hereto, is a fair and accurate description of the evidence the government believes it can prove regarding your client's actions. Your

Mr. Tony Miles, Esq.
March 9, 2006

client accepts the factual proffer and accepts responsibility for the conduct described in the Statement of the Offenses. Prior to the Rule 11 plea hearing, your client will adopt and sign the Statement of the Offenses as a written proffer of evidence by the United States.

   2. **Potential penalties, assessments, and restitution**. Your client understands that pursuant to Title 18, United States Code, Section 1203, Hostage Taking, the charge carries a maximum penalty of life in prison, a fine of $250,000, and a maximum term of supervised release of five years. The parties will leave for the Court to determine whether your client has the present ability to pay any fine. In addition, your client agrees to pay a special assessment of $100 to the Clerk of the Court, U.S. District Courthouse, prior to the date of sentencing. Your client further understands that, pursuant to Section 5E1.2 of the United States Sentencing Guidelines ("Sentencing Guidelines"), the Court may also impose a fine sufficient to pay the federal government the costs of any imprisonment.

   3. **Additional charges**. If your client fulfills all obligations under this plea agreement, at the time of sentencing in this matter, the United States will move to dismiss Count Two of the indictment, which charges Using and Carrying a Firearm During Crime of Violence, in violation of Title 18, United States Code, Section 924(c). With respect to any such charge to be dismissed at the time of your client's sentencing pursuant to this agreement, your client acknowledges and agrees that such charges are based in fact and the dismissal of such charges is solely a part of the consideration for this agreement and for no other reason and provides your client with no basis to claim "prevailing party" status under the "Hyde Amendment," P. L. 105-119 (1997). Further, your client specifically agrees not to file any claim under that law.

   4. **Detention pending sentencing**. Your client agrees not to object to the government's recommendation to the Court at the time of the plea of guilty in this case that, pursuant to 18 U.S.C. § 3143, your client be detained without bond pending your client's sentencing in this case.

   5. **Waiver of constitutional and statutory rights**. Your client understands that by pleading guilty in this case, your client agrees to waive certain rights afforded by the Constitution of the United States and/or by statute, including:

Mr. Tony Miles, Esq.
March 9, 2006

the right to plead not guilty; and the right to a jury trial. At a jury trial, your client would have the right to be represented by counsel, to confront and cross-examine witnesses against your client, to compel witnesses to appear to testify and present other evidence on your client's behalf, and to choose whether to testify. If your client chose not to testify at a jury trial, your client would have the right to have the jury instructed that your client's failure to testify could not be held against your client. Your client would further have the right to have the jury instructed that your client is presumed innocent until proven guilty, and that the burden would be on the United States to prove your client's guilt beyond a reasonable doubt. If your client were found guilty after a trial, your client would have the right to appeal the conviction.

Your client understands that the Fifth Amendment to the Constitution of the United States protects your client from the use of self-incriminating statements in a criminal prosecution. By entering this plea of guilty, your client knowingly and voluntarily waives or gives up this right against self-incrimination.

6. **Sentencing Guidelines**. Your client understands that the United States Sentencing Guidelines are advisory to the Court in determining the appropriate sentence. Your client agrees and understands that even though the Sentencing Guidelines are not binding upon the Court, the Court nevertheless should consult the Sentencing Guidelines in determining an appropriate sentence. Accordingly, the parties agree and understand that the defendant's sentence would be guided by the Sentencing Guidelines as described in the attached **Attachment B** hereto.

Your client agrees that the United States can demonstrate by a preponderance of the evidence facts sufficient to establish that your client's offense levels are as outlined in Attachment B hereto. Under the calculations outlined in Attachment B hereto, your client's total adjusted offense level is 43 for the hostage taking. Upon entering a plea of guilty, he will receive a downward adjustment of 3 levels for acceptance of responsibility, thus bringing his adjusted offense level down to 40, assuming a criminal history category of I[1] with a Guidelines range of 292-

---

[1] The government does not yet have any information on your client's criminal history, which may ultimately affect your

Mr. Tony Miles, Esq.
March 9, 2006

365 months.

The government agrees that it will not seek any increases in your client's base offense level other than those which are agreed to by your client in this agreement. The government further agrees that it will not seek an upward departure from the otherwise applicable range established by the Sentencing Guidelines. Your client agrees that, aside from a departure for providing substantial assistance to the government, as discussed below, he will not seek a downward departure or any decreases from the otherwise applicable range established by the Sentencing Guidelines.

Your client fully and completely understands that the final determination of how the United States Sentencing Guidelines apply to this case will be made solely by the Court and that the above calculations or recommendations are not binding upon the Court or the United States Probation Office. Your client understands that the failure of the Court or the Probation Office to determine the guideline range in accordance with the above calculations will not void this plea agreement or serve as a basis for the withdrawal of this plea. Your client understands and agrees that your client will not be allowed to withdraw the guilty plea entered pursuant to this plea agreement solely because of the harshness of any sentence recommended by the Probation Office or imposed by the Court, and that a motion to withdraw the plea on that basis may be treated by the United States as a breach of this plea agreement.

7. **Cooperation with the United States**. Your client agrees to cooperate fully, completely, and truthfully with all investigators and attorneys of the United States, by truthfully providing all information in your client's possession relating directly or indirectly to all criminal activity and related matters which concern the subject matter of this investigation and of which he has knowledge, or relating to other matters deemed relevant by the United States. Such matters include, but are not limited to, the activities of his coconspirators in the abduction and hostage-taking of the five-year old American boy M.D. in October 2005.

(a) Your client shall cooperate pursuant to this agreement

---

client's Guidelines range.

Mr. Tony Miles, Esq.
March 9, 2006

whenever, and in whatever form, the United States Attorney's Office shall reasonably request. This includes, but is not limited to, submitting to interviews; answering interrogatories; giving sworn written statements; providing documents and any other evidence in your client's possession; giving testimony; giving depositions; taking government administered polygraph examination(s); and participating in covert law enforcement activities.

    (b) Your client acknowledges and understands that during the course of the cooperation outlined in this agreement your client will be interviewed by law enforcement agents and/or Government attorneys and that your client has the right to have defense counsel present during these interviews. After consultation with you, and with your concurrence, your client knowingly and voluntarily waives this right and agrees to meet with law enforcement agents and Government prosecutors outside of the presence of counsel. If at some future point you or your client desire to have counsel present during interviews by law enforcement agents and/or Government attorneys, and you communicate this decision in writing to this Office, the Government will honor this request, and this change will have no effect on any other terms and conditions of this agreement.

    (c) Your client shall testify fully and truthfully before any Grand Jury in the District of Columbia, and elsewhere, and at all trials of cases or other court proceedings in the District of Columbia and elsewhere, at which your client's testimony may be deemed relevant by the United States.

    (d) Your client shall promptly turn over to the government or other law enforcement authorities or direct such law enforcement authorities to any and all evidence of crime; all contraband and proceeds of crime; and all assets traceable to such proceeds of crime.

    (e) Your client shall submit a full and complete accounting of all your client's financial assets, whether such assets are in your client's name or in the name of a third party.

    (f) Your client agrees not to commit any criminal violation of local, state or federal law during the period of your client's cooperation with law enforcement authorities pursuant to this agreement or at any time prior to the sentencing in this case. The commission of a criminal offense during the period of your

Mr. Tony Miles, Esq.
March 9, 2006

client's cooperation or at any time prior to sentencing will constitute a breach of this plea agreement and will relieve the government of all of its obligations under this agreement. However, your client acknowledges and agrees that such a breach of this agreement will not entitle your client to withdraw your client's plea of guilty. Your client further understands that, to establish a breach of this agreement, the government need only prove your client's commission of a criminal offense by probable cause.

8. **Substantial assistance.** Following the completion of your client's cooperation, we will inform the Departure Committee of the United States Attorney's Office for the District of Columbia of the nature and extent of your client's cooperation, or lack thereof. If the Departure Committee of the United States Attorney's Office for the District of Columbia, after evaluating the full nature and extent of your client's cooperation, or lack thereof, determines that your client has provided substantial assistance in the investigation or prosecution of another person who has committed any offense, then the United States will file a motion pursuant to United States Sentencing Guidelines section 5K1.1 to afford your client an opportunity to persuade the Court that your client should be sentenced to a lesser period of incarceration and/or fine than provided for by the sentencing guidelines.

Your client understands that the determination of whether your client has provided "substantial assistance" is within the sole discretion of the United States Attorney for the District of Columbia and is not subject to review by the Court. Nor shall the failure of this Office to file a "substantial assistance" departure motion be grounds for your client to move to withdraw the plea of guilty in this case. Your client also understands that the issue of his deportation is solely within the discretion of the Department of Homeland Security.

Your client understands further that ultimately the sentence to be imposed is a matter solely within the discretion of the Court, and the Court is not obligated to grant a downward departure based on your client's substantial assistance to the United States, notwithstanding the filing by the United States of any motion for departure from either the statutory minimum sentence or the applicable guidelines range. Your client also understands that neither the United States District Court for the

-6-

Mr. Tony Miles, Esq.
March 9, 2006

District of Columbia nor any of its judges are a party to this agreement.

    9.  **Interpreter**.  Your client agrees that if an interpreter is required to assist your client in translating this plea agreement into your client's native language, then your client agrees to request the Court, pursuant to 28 U.S.C. § 1827, "The Court Interpreter's Act", to secure the services of a certified interpreter at Court expense to verbally translate the plea agreement for your client into your client's native language.  Your client agrees that it is unnecessary for the plea document to be re-written into your client's native language.

    10.  **Reservation of allocution**.  Your client understands that the United States reserves its full right of allocution for purposes of sentencing in this matter.  The United States reserves the right to describe fully, both orally and in writing, to the sentencing judge the nature and seriousness of your client's misconduct, including misconduct not described in the charge to which your client is pleading guilty.  The United States also reserves the right to inform the presentence report writer and the Court of any relevant facts, to dispute any factual inaccuracies in the presentence report, and to contest any matters not provided for in this plea agreement.

    (a) Your client also understands that the United States retains its full right of allocution in connection with any post-sentence motion which may be filed in this matter and/or any proceeding(s) before the Bureau of Prisons.  The United States reserves the right to appeal the sentence in this case.  In addition, if in this plea agreement the United States has agreed to recommend or refrain from recommending to the Court a particular resolution of any sentencing issue, the United States reserves its right of full allocution in any post-sentence litigation or appeal in order to defend the Court's ultimate decision on such issues.

    (b) Your client acknowledges discussing with you Federal Rule of Criminal Procedure 11(e)(6) and Federal Rule of Evidence 410, rules which ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn.  Your client knowingly and voluntarily waives the rights which arise under these rules.  As a result of this waiver, your client understands and agrees that any statements which are made in the course of

Mr. Tony Miles, Esq.
March 9, 2006

your client's guilty plea will be admissible against your client for any purpose in any criminal or civil proceeding if your client breaches this plea agreement or your client's guilty plea is subsequently withdrawn.

(c) Any prosecutions of your client not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement may be commenced against your client in accordance with this paragraph, notwithstanding the running of the statute of limitations before the commencement of such prosecutions. Your client knowingly and voluntarily agrees to waive any and all defenses based on the statute of limitations for any prosecutions commenced pursuant to the provisions of this paragraph.

(d) Your client understands and agrees that the United States shall only be required to prove a breach of this plea agreement by a preponderance of the evidence. Your client further understands and agrees that the United States need only prove a violation of federal, state, or local criminal law by probable cause in order to establish a breach of this plea agreement.

(e) Nothing in this agreement shall be construed to permit your client to commit perjury, to make false statements or declarations, to obstruct justice, or to protect your client from prosecution for any crimes not included within this agreement or committed by your client after the execution of this agreement. Your client understands and agrees that the United States reserves the right to prosecute him/her for any such offenses. Your client further understands that any perjury, false statements or declarations, or obstruction of justice relating to your client's obligations under this agreement shall constitute a breach of this agreement. However, in the event of such a breach, your client will not be allowed to withdraw this guilty plea.

11. **Prosecution by other agencies/jurisdictions**. This agreement only binds the United States Attorney's Office for the District of Columbia. It does not bind any other United States Attorney's Office or any other office or agency of the United States government, including, but not limited to: the Tax Division of the United States Department of Justice; the Internal Revenue Service of the United States Department of the Treasury; the Bureau of Immigration and Customs Enforcement of the

-8-

Mr. Tony Miles, Esq.
March 9, 2006

Department of Homeland Security; or any state or local prosecutor. These individuals, and agencies remain free to prosecute your client for any offense(s) committed within their respective jurisdictions.

    12.  **No other agreements**. No other agreements, promises, understandings, or representations have been made by the parties other than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by your client, your client's counsel, and an Assistant United States Attorney for the District of Columbia, or made by the parties on the record before the Court.

    If your client agrees to the conditions set forth in this letter, both your client and you should sign the original in the spaces provided below and return the executed plea agreement to me. The original of this plea agreement will be filed with the Court.

                      Sincerely,

                        KENNETH L. WAINSTEIN
                        United States Attorney

                        JEANNE M. HAUCH
                        Assistant United States Attorney
                        National Security Section
                        D.C. Bar #426585
                        555 Fourth Street, N.W.
                        Washington, D.C. 20530
                        (202) 514-5776

                        THOMAS P. SWANTON
                        Trial Attorney
                        D.C. Bar No 462144
                        Counterterrorism Section,
                          Criminal Division
                        U.S. Department of Justice
                        10th & Constitution Ave., NW
                        Washington, D.C.  20530
                        (202) 514-0849

Mr. Tony Miles, Esq.
March 9, 2006

    I have had read to me this plea agreement and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this plea agreement and all matters relating to it. I fully understand this plea agreement and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this plea agreement fully. No agreements, promises, understandings, or representations have been made with, to, or for me other than those set forth above.

3/10/06
Date

JOSEPHJEROME
Jerome Joseph, Defendant

    I am defendant's attorney. I have reviewed every part of this plea agreement with him. It accurately and completely sets forth the entire agreement between defendant and the Office of the United States Attorney for the District of Columbia.

3/10/06
Date

Tony W. M___
Tony Miles, Esq.
Counsel for Defendant

ATTACHMENT A

STATEMENT OF THE OFFENSES

**Introduction**

    The government's evidence at trial would prove beyond a reasonable doubt that on October 11, 2005, at approximately 5 p.m., JEROME JOSEPH, AKA JAMES PIERRE [hereinafter JOSEPH/PIERRE], WIDMAY DORVILIER [hereinafter DORVILIER] and another male (hereinafter "the hostage takers"), with guns drawn, accosted a five-year old boy and his father as they were about to leave the school where the father worked in Port au Prince, Haiti. The little boy is five years old and is a citizen of the United States, having been born in Florida in 2000.

    Just as the father was preparing to get into his car to drive home with the child, three men accosted them in the parking lot. One of these men was defendant JOSEPH/PIERRE and another was DORVILIER. At least two of the three men were displaying guns. JOSEPH/PIERRE was armed with a loaded handgun and displayed it. The men threw the father into the back seat and the men climbed into the car. One of the men got into the driver's seat and drove away. After driving a short distance, they stopped the car to pick up a fourth individual, who got into the car with them. They drove awhile and then stopped the vehicle and ejected the father from the car. Before pushing the father out of the car, they stole from him some money, a cell phone, and some jewelry. The hostage-takers instructed the father to telephone them later at the number of the father's own cell phone, which they had just stolen from him.

    The father made his way back to his place of employment and told several people what had just happened. At that time he did not report the kidnaping to the police for fear that reporting the incident to the police might result in retaliation or harm to his son.

    At about 7 p.m. that night, the father telephoned the hostage takers. They told him to relax and that they would call him back later. At about 9 p.m., the hostage takers called back. One of the hostage takers told the father that if he wanted to get his son back, he would have to give them 300,000 "green ones," which the father took to mean United States dollars. They also said that if the father did not do that, they would bring the disembodied head of the son to the father in the morning. The father expressed to the hostage takers that he did not have a way to get that amount of money, and certainly not in that time frame. The hostage takers again stated their demand and hung up

-11-

the phone.

Some of the colleagues and friends of the father who knew of the situation had notified the police. On the next day, Wednesday, October 12, the day after the kidnaping, at about 6 a.m., the hostage takers again telephoned the father and told him to "go get the money" and then hung up. At 8 a.m., they telephoned again to ask "what happened to the money." The father informed them that he could only come up with approximately $1,875 U.S. dollars ("USD"). They instructed him to find more money. That same day, some friends of the father, knowing that the child was a United States citizen, reported the incident to the United States Embassy in Port au Prince, Haiti.

Over the next hours of Wednesday, October 12, the father received more calls demanding ransom from the hostage takers. They again threatened to kill the boy. The father tried to persuade them to lower their demands, but they would not budge. By 8 p.m., the father had managed to raise more money, approximately USD $2,800. The hostage takers again threatened to kill the child if USD $300,000 was not paid. The threatening calls continued through Wednesday night and into Thursday, October 13.

On the morning of Thursday, October 13, the hostage takers spoke with the father by telephone again. This time they threatened to cut the boy into pieces and return him to the father in a bag unless the money was paid. They did not specify exactly when they would do this.

At about 2 p.m. that same day, Thursday, the hostage takers telephoned the father again. They informed him that the boy was not doing well, was crying often, and begging for his father. The father told them that he could pay approximately USD $3,750 but that he wanted some proof that his son was still alive before he paid the money. The hostage takers hung up the phone. Around 5 p.m., they called back and again asked the father where the money was. That evening, Thursday, the father went to a location he had arranged with the hostage takers to pay them the money he had managed to raise. The father went to the place and handed an envelope with the money to a black male who was one of the original kidnappers.

The following day, Friday, October 14, the hostage takers again contacted the father about the payment of the ransom money. The father told them he had already given them all he had but that he would call some friends in the United States to see if they would wire him some money. The hostage takers asked if the father really believed that he could get money from the United

-12-

States.  The father said that he was going to try, but first wanted to talk to the boy to make sure he was still alive.  The hostage takers agree to put the boy on the phone in about one hour during the next call, which they did.  The father spoke to the boy briefly.  The father told the hostage takers to call him back at approximately 2 p.m. that day.

Later the same day, at approximately 1 p.m., the police in Haiti received information from a citizen on where the hostage takers were holding the boy.  They proceeded to that location and found the boy.  With the boy was an adult male.  The boy was playing in a yard in front of a house.  The adult male was sitting on the front porch watching him and was the only adult at the house.  When the police arrived, the adult male fled into the house and hid under the bed.  Police rescued the child and took that adult male into custody.

Apparently, not yet having learned that the child had been rescued, the other hostage takers continued their demands of the father for more money.  Earlier in the day the father had told them that he would try to raise additional money for ransom from contacts in the United States.  Just as the father was driving to the police station to be reunited with his son, he received another demand call from the hostage takers.  Police advised the father to tell them that he had the money and that he would meet them to hand it over.  The father told the hostage takers that he had USD $5,000 and that he would pay at the same location as the day before.

The father went to the payoff location, where police had set up surveillance.  The father was driving a friend's vehicle.  Defendant JOSEPH/PIERRE, one of the original kidnapers, came up to the father and accepted an envelope.  DORVILIER accompanied JOSEPH/PIERRE.  Police moved in and were able to take JOSEPH/PIERRE into custody, but DORVILIER fled and eluded police.

JOSEPH/PIERRE was searched upon his arrest and found to be in possession of a loaded 9 mm handgun.  The FBI is in possession of the gun and ammunition.

After his arrest, the FBI interviewed JOSEPH/PIERRE on two different dates, October 14 and November 10, 2005.  At the start of both interviews, the FBI informed JOSEPH/PIERRE of his rights in his native language, which he waived both times.  JOSEPH/PIERRE identified himself as James Pierre.  JOSEPH/PIERRE gave a statement confessing to his participation in the hostage-taking.  He also implicated his coconspirators, one of whom was in charge of the conspiracy, "WIDMAYER," AKA WIDMAY DORVILIER, another who was the adult male who was holding the child, and two

-13-

other individuals, one of whom had access to inside information about the father's activities, and another male, who was an active participant in the initial carjacking. While at the police station, JOSEPH/PIERRE was in a position to see the adult male who was holding the child and told the FBI that he was one of the kidnapers. JOSEPH/PIERRE stated that the 9 mm. handgun he possessed upon his arrest was the same handgun he had used during the carjacking and hostage taking.

In the November 10 interview, JOSEPH/PIERRE admitted that he had given his alias as his name during the October 14 interview. JOSEPH/PIERRE again admitted to his involvement in the kidnaping and supplemented some of his earlier statements. For example, JOSEPH/PIERRE stated he had known DORVILIER for his whole life and that he is a member of DORVILIER's gang. JOSEPH/PIERRE was not shown a photograph of DORVILIER, but said that he recognized DORVILIER when DORVILIER was brought to the police station. DORVILIER was arrested several days after JOSEPH/PIERRE.

Acknowledgment:

I have had read to me this Statement of Offenses and carefully reviewed every part of it with my attorney. I agree that it is a fair and accurate description of what happened with respect to all parts of it of which I have knowledge.

3/10/06
Date

JOSEPH JEROME
Jerome Joseph, Defendant

I am defendant's attorney. I have reviewed every part of this Statement of Offenses with him.

3/10/06
Date

Tony W. M——
Tony Miles, Esq.
Counsel for Defendant

ATTACHMENT B:

SENTENCING GUIDELINES CALCULATIONS FOR JEROME JOSEPH:

BASE OFFENSE: 18 U.S.C. § 1203(a)

| 1203(a) | Hostage taking | | |
|---|---|---|---|
| | Kidnaping, Abduction, Unlawful Restraint (2A4.1(a)) | BOL | 32 |
| | Ransom demand (2A4.1(b)(1)) | | 6 |
| | Use of dangerous weapon (2A4.1(b)(3)) | | 2 |
| | Minor victim placed in care of another (2A4.1(b)(6)) | | 3 |
| | TOTAL | | 43 |

At level 43 and criminal history category I, the range is life. With three points deducted for acceptance of responsibility, he goes from level 43 to level 40. **At level 40 and criminal history category of I, the range is 292-365 months (24 years 4 months to 30 years 5 months).**

CHARGE TO BE DISMISSED AT SENTENCING:

924(c)  Using and Carrying a Firearm During a
Crime of Violence ("COV") (2K2.4)

> COV here is hostage taking
>minimum term required by statute  **7 YEARS**
< maximum life

- must be consecutive to any other sentence

If your client were to be found guilty of this offense, the 924(c) offense would not group for purposes of its mandatory minimum, which must by statute, be consecutive to any other sentence. See § 3D1.1(b)(1). For the 924(c), the mandatory minimum would be 7 years. This would be in addition to the sentence noted above for the § 1203 hostage-taking offense.