**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **CRIMINAL NO. 05-410 (CKK)** |
| | : | |
| **JEROME JOSEPH** | : | |
| | : | |
| **Defendant.** | : | |

---

## MEMORANDUM IN AID OF SENTENCING

Defendant Jerome Joseph, through counsel, respectfully submits the following Memorandum in aid of his sentencing.

On January 30, 2008, Jerome Joseph will come before this Court to be sentenced pursuant to his guilty plea to Hostage Taking, in violation of 18 U.S.C. § 1203. Based on all the sentencing factors in this case, Mr. Joseph submits that a sentence of eighty four months incarceration is the appropriate sentence in this matter. Due to such factors as the circumstances surrounding the offense, Mr. Joseph's background, Mr. Joseph's acceptance of responsibility, Mr. Joseph's substantial assistance to the government, the United States Sentencing Guidelines and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a),  a sentence of eighty four months is a fair and reasonable sentence.

## DISCUSSION

**I.      THE POST-BOOKER SENTENCING FRAMEWORK.**

Under Justice Breyer's majority opinion in Booker, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.

1

See 18 U.S.C. § 3553(a)(4)." United States v. Booker, 125 S.Ct. 738 (2005). While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the remedial majority in Booker held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Pursuant to Booker, therefore, courts must treat the Guidelines as one, among several, sentencing factor.

        Pursuant to 18 U.S.C. §§ 3562 and 3553(a) – which were explicitly endorsed by the Supreme Court in Booker – sentencing courts should consider the need for the sentence imposed:

>        (A) to reflect the seriousness of the offense, to promote respect
>
>        for the law, and to provide just punishment for the offense;
>
>        (B) to afford adequate deterrence to criminal conduct;
>
>        (C) to protect the public from further crimes of the defendant;
>
>        and
>
>        (D) to provide the defendant with the needed educational and
>
>        vocational training, medical care, or other correctional
>
>        treatment in the most effective manner.

        Specifically, courts should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth above.

        Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged.

Pursuant to 18 U.S.C. § 3661, also expressly endorsed by the <u>Booker</u> majority:

No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence.

Section 3582 of Title 18 states that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

Taken together, the directives of <u>Booker</u>, as well as Sections 3553, 3661, and 3582 of Title 18, make it clear that sentencing courts may no longer consider the Guidelines alone in determining the appropriate sentence. After <u>Booker</u>, courts need not justify sentences outside the guideline range by citing factors that take the case outside the "heartland." Rather, as long as the sentence imposed is reasonable and supported by the factors outlined in Section 3553, courts may exercise their discretion in individual cases and impose sentences which are not within the proposed guideline range.

## II.    A SENTENCE OF EIGHTY FOUR MONTHS IS REASONABLE AND APPROPRIATE.

### A.    **Background**.

Jerome Joseph was born and raised in the severely impoverished and volatile country of Haiti. Haiti is the poorest country in the Western Hemisphere, as well as one of the poorest in the world. The United Nations' Human Development Index, which measures "well being" in a country by comparing life expectancy, literacy, education and standard of living, ranks Haiti 155th of 177 countries. <u>See</u> <u>2006 Human Development Report</u> at <u>http://hdr.undp.org/hdr2006/statistics/</u>. Two thirds of Haiti's eight million citizens live in poverty, while only one quarter of the country's children attend school. <u>See</u>

Haiti's Economic Challenge, Robert Perito and Emily Hsu, United States Institute of Peace Briefing at http://www.usip.org/pubs/usipeace_briefings/2006/0717_haiti_economy.html.

Since the 1970s, Haiti's economy has experienced a steady decline and, since the abrupt departure of President Aristide in 2005, the political, security and socio-economic situation remains in crisis (International Crisis Group). Violence is extremely high and the weak national government is further hindered by human rights abuses at the hands of the Haitian National Police (HNP). The majority of Haitian citizens live in poverty without jobs, adequate food, or health care. In the last two years, frustration among Haitians has been growing. (International Crisis Group).

Mr. Joseph was raised in Haiti's urban capital city of Port au Prince. PSR, ¶ 35. Sadly, the miserable conditions which many Haitians suffer was a routine part of Mr. Joseph's life. Mr. Joseph grew up under extremely poor conditions and he was often denied basic necessities. As an example, food was very scarce in his household and he typically had only one meal per day. PSR, ¶ 36. Mr. Joseph also received no formal education and he cannot even read or write in his native language. PSR, ¶ 42.

Although Mr. Joseph wanted to assist his family financially, employment in Haiti was scarce and jobs were difficult to obtain. Nevertheless, Mr. Joseph was able to gain some limited employment experience and provide some meager financial assistance to his family. PSR, ¶ 44. When describing his life, Mr. Joseph reports that "[l]ife was not good at all" and that "Haiti has nothing to offer." PSR, ¶ 36. Such unfortunate conditions surely had a deleterious impact on Mr. Joseph and Mr. Joseph acknowledges this impact when he met with the PSR writer. Id..

Although Mr. Joseph has no prior convictions, he, like too many disadvantaged Haitian youth, ultimately turned to criminal behavior as a means of support. Mr. Joseph made an unfortunate

turn in his life when he began engaging in criminal conduct for Widmay Dorvilier[1] in hopes of improving his own economic condition.  As part of this conduct, Mr. Joseph foolishly agreed to assist Mr. Dorvilier and others in the commission of the instant offense.  Mr. Dorvilier was clearly the person who played the leading role in the instant crime and Mr. Dorvilier was the planner and organizer of the offense.[2] Mr. Dorvilier was involved in the ransom negotiations with the father and Mr. Dorvilier is the person who made the awful threatening statements to the father.  Mr. Joseph played no part in the negotiations and he was unaware of the aggressive tactics being used by Mr. Dorvilier.

While Mr. Dorvilier was the leader and organizer of the offense, Mr. Joseph's conduct was admittedly shameful and inexcusable.  Mr. Joseph had no desire or intent to cause any injury or pain to the victims in this case.  Mr. Joseph was motivated by the notion of improving his social condition and he failed to give proper consideration to the impact his behavior would have on the victims.  Of course, Mr. Joseph's actions did cause substantial harm to the victims and Mr. Joseph should have known such harm would result from his conduct.  Mr. Joseph is aware that it was a tremendous lapse in judgment to allow Mr. Dorvilier to influence him to participate in the  instant offense and to accept a firearm from Mr. Dorvilier.  Mr. Joseph seriously regrets his involvement in the offense and he is very remorseful.  Mr. Joseph is sorry for the harm he has caused the victims and he has no intent to ever engage in criminal conduct in the future.

---

[1]Widmay Dorvilier is a lifetime associate of Mr. Joseph who became a leader of criminal activity in Mr. Joseph's neighborhood.  Mr. Dorvilier is a codefendant in the instant offense and he has been convicted of this offense in a separate case before this Court.

[2]According the government's Motion for Downward Departure which was filed in this case, the evidence, which includes Mr. Dorvilier's own statements, shows that Mr. Dorvilier was the leader, planner and organizer of the instant offense.

Mr. Joseph has demonstrated his commitment to abandon his short lived life of crime by immediately accepting responsibility for his conduct and by assisting the government in prosecuting others involved in criminal behavior. Even as early as the time of his arrest in Haiti, Mr. Joseph admitted to his role in the instant offense when speaking with law enforcement in Haiti. See Government's Motion for Downward Departure at 7. Mr. Joseph met with Federal Bureau of Investigation (FBI) agents on at least two occasions in Haiti and provided them with information concerning his conduct during each meeting. Id.. During these meetings, Mr. Joseph also provided information concerning the other individuals involved in the offense. Id.. In fact, prior to Widmay Dorvilier's arrest, Mr. Joseph was willing to assist the police in capturing Mr. Dorvilier and Mr. Joseph was willing to testify against Mr. Dorvilier. See Government's Motion for Downward Departure at 11.

Shortly after arriving to the District of Columbia for his prosecution, Mr. Joseph agreed to meet with law enforcement and federal prosecutors about his role and the role of others in the instant offense. Mr. Joseph continued to accept responsibility for his conduct and he continued to provide information concerning others who were involved. Mr. Joseph continued with his willingness to do whatever the government requested of him in order to assist with their prosecution of others. Mr. Joseph eventually demonstrated his acceptance of responsibility before this court by entering into a guilty plea in this case. After pleading guilty, Mr. Joseph continued meeting with law enforcement and he continued to assist the government. The government acknowledges that Mr. Joseph's assistance enabled the government to indict a third participant in the hostage taking (i.e. Fanel Joseph), to have Fanel Joseph arrested in Haiti and to have Fanel Joseph extradited to the District

of Columbia for prosecution.  <u>See</u> Government's Motion for Downward Departure at pp. 9 & 12.[3] The defense believes that Mr. Joseph's cooperation with the government also played a role in influencing Mr. Dorvilier to resolve his case by entering into a guilty plea.

Mr. Joseph's assistance to the government has gone further than assisting the government in prosecuting Widmay Dorvilier, Fanel Joseph and his own case.  Mr. Joseph has provided all the assistance he could possibly provide with respect to other individuals involved in the instant offense. One such individual has been identified in the government's Departure Motion as "Conspirator J." Based on information provided by Mr. Joseph, the government had enough evidence and leads to attempt to locate "Conspirator J" and to have him arrested and prosecuted.  <u>See</u> Government's Motion for Downward Departure at 12.

Mr. Joseph also provided assistance to the government in connection with offenses not related to the instant case.  For example, Mr. Joseph provided information concerning the attempt by particular individuals to commit a crime of violence against a previously high ranking United States governmental official while that official was visiting Haiti.

Mr. Joseph agreed to cooperate with the government despite the great risk of injury he or his family members could suffer as a result of his assistance.  From the very beginning, Mr. Joseph feared that he or his family members would be harmed because of his cooperation.  Mr. Joseph has insisted that he be separated from Mr. Dorvilier at the D.C. Jail and/or at the Correctional Treatment Facility (CTF) and he has expressed a desire to appear in court on days which are different from the days on which Mr. Dorvilier or any other defendant associated with this case appear.  Additionally,

---

[3]Fanel Joseph ultimately pled guilty.  <u>See</u> Government's Motion for Downward Departure at 9.

Mr. Joseph has previously advised the government of his concerns for the safety of his wife, his child and his mother in the event word of his cooperation reaches Haiti. Later, Mr. Joseph continued to express his concern for the safety of his family during his meeting with the PSR writer. See PSR, ¶37.

**B.     United States Sentencing Guidelines**.

1. Sentencing Guidelines Calculations

According to the Presentence Report (PSR) in this case, Jerome Joseph's Total Offense Level is 40 and his Criminal History Category is Category I. The PSR calculates Mr. Joseph's sentencing guideline range as being 292-365 months.[4]

2. Substantial Assistance Departure

Through a motion, the government has informed this Court that Mr. Joseph has provided Substantial Assistance to the government in its efforts to prosecute other individuals. See Government's Motion for Downward Departure. Therefore, pursuant to U.S.S.G. § 5K1.1, the government is requesting that this Court depart from the Sentencing Guidelines by three levels and find that Mr. Joseph's modified Offense Level is level 37. With this modification, Mr. Joseph's sentencing guideline range is 210-262 months.

Due to the timeliness, the completeness and the significance of Mr. Joseph's substantial assistance, as well as the risks he has endured, Mr. Joseph submits that a seven level reduction is a more fair and appropriate departure. As discussed above, Mr. Joseph began cooperating with law enforcement immediately after his arrest. While Mr. Joseph was still in Haiti, he meet with law enforcement on at least two occasions and provided very detailed information concerning his

---

[4]The defense does not object to the calculations in the PSR.

involvement in the instant offense as well as the involvement of others in the instant offense. While still in Haiti, Mr. Joseph made an early commitment to assist law enforcement with the arrest of the leader of the offense and to testify against the leader if necessary. Soon after his extradition to the District of Columbia, Mr. Joseph continued to cooperate with the same vigor he showed in Haiti. Prior to pleading guilty in this case, Mr. Joseph meet with law enforcement and prosecutors. During these meetings, Mr. Joseph continued to provide extensive details concerning his conduct and the conduct of others. Mr. Joseph also provided details of other violent crimes occurring in Haiti which were not related to the instant offense.[5] While in the District of Columbia, Mr. Joseph continued to assist law enforcement with their efforts to capture other offenders in Haiti and Mr. Joseph persisted in his willingness to testify against anyone the government may choose to prosecute. Based on this conduct, Mr. Joseph's substantial assistance was clearly very timely and very complete.

The great significance and importance of Mr. Joseph's cooperation is very apparent. Hostage taking has become a serious problem in Haiti. Due to extreme economic disparities between Haiti and the United States, citizens of the United States are particularly vulnerable to being taken has hostages in Haiti because of the perception that a substantially larger ransom can be obtained from the family members of Americans. By assisting the government in prosecuting those involved in taking United States citizens as hostages, Mr. Joseph has played a critical role in alleviating the hostage taking crisis. In this case, Mr. Joseph assisted the government in the successful prosecution of his own conduct as well as in the successful prosecution of the conduct of two other individuals (i.e. Widmay Dorvilier and Fanel Joseph). Significantly, one of these other individuals was the

---

[5]At least one of these violent crimes was committed against a high level United States governmental official and Mr. Joseph played no role in that offense.

leader of a gang in Haiti which has a history of taking hostage victims. Mr. Joseph has also assisted the government in its attempt to prosecute additional hostage taking individuals and other violent persons who are still located in Haiti.

The risks Mr. Joseph has faced as a result of his cooperation are great. Mr. Joseph has cooperated against two individuals who are incarcerated with him in the District of Columbia Department of Corrections system. Mr. Joseph, therefore, is risking serious injury, and even his life, by cooperating against individuals with whom he may have contact. Mr. Joseph is aware that, even if he does not have any direct contact with these individuals, his safety is still in jeopardy because he can be harmed by others acting on behalf of those against whom he is cooperating or by others who have become aware of his informant status.[6] Mr. Joseph has also been very concerned for the safety of his family members in Haiti. The threat to his family in Haiti has always been a serious concern because information about his cooperation could easily travel to Haiti through a simple telephone call or letter. Mr. Dorvilier's status as a gang leader in Haiti has only compounded this problem for Mr. Joseph. With the power and influence Mr. Dorvilier possess as a gang leader, any "hit" Mr. Dorvilier may seek to place on Mr. Joseph's family members has a serious possibility of being carried out.[7]

### 3. _Smith_ Departure

The PSR advises that a downward departure may be warranted in this case due to Mr. Joseph's status as a "deportable alien." PSR, ¶¶ 63 & 64. The PSR notes that an "illegal alien" who

---

[6]During the initial stages of Mr. Joseph's case, he was very concerned and stressed about his safety. However, with the passing of time and with the later awareness that Mr. Dorvilier is also cooperating, Mr. Joseph's safety concerns, while still present, have been reduced.

[7]Mr. Joseph has been most concerned about the safety of his mother, his wife and one his children because Mr. Joseph believes that Mr. Dorvilier is familiar with their whereabouts.

is serving a federal sentence "must serve the entire sentence imposed (minus credit for time served and statutory good time credit) before being deported." PSR, ¶ 63. The PSR further warns that "deportable aliens" who will not be released in the United States are ineligible for Bureau of Prison pre-release programs. PSR, ¶ 64. Additionally, an "illegal alien" serving a federal sentence will be precluded from eligibility in certain programs while serving his sentence. PSR, ¶ 63.

Defendants serving federal sentences who are subject to deportation are further disadvantaged in cases where they are unable to speak English. In such cases, a defendant has greater difficulty communicating with prison staff and there are fewer inmates with whom they can associate. The severity of this language disadvantage varies depending on the language or languages the defendant can speak[8] and how well the defendant can participate in some type of discussion in English. In Mr. Joseph's case, because he speaks virtually no English and he can only converse in a language which is rarely spoken in the United States,[9] the disadvantages he has suffered and will continue to suffer in prison due to the language barrier he faces is severe.

As discussed in the PSR and here, simply due to Mr. Joseph's status as a deportable alien, he will not receive many benefits which are routinely afforded other inmates. Consequently, Mr. Joseph will be more severely punished than other similarly situated defendants due to his immigration status. Mr. Joseph will be more severely punished in both the duration of his sentence and in the quality of life he will endure while serving his sentence in a Bureau of Prisons facility. Following Mr. Joseph's prison sentence, it is expected that he will spend additional time in custody

---

[8]When a defendant who speaks a foreign language speaks a language which is also spoken by a reasonable amount of other prison staff persons and/or other inmates, the effects of any language barrier are not as harmful.

[9]Mr. Joseph speaks Haitian Creole.

as his matter is being handled by the immigration authorities. For the foregoing reasons, and for any other reasons that the Court may deem just and proper, Mr. Joseph respectfully requests the Court to grant his request for a downward departure based upon his status as a deportable alien. See United States v Smith, 27 F.3d 649 (D.C. Cir. 1994). Mr. Joseph requests a two level downward departure on this basis.[10]

### C.     18 U.S.C. § 3553(a) Factors.

When balancing the severity of Mr. Joseph's conduct and the harm he caused the victims on the one hand with his cooperation, early acceptance of responsibilities and his background on the other hand, a sentence of eighty four months will adequately reflect the seriousness of this offense. See 18 U.S.C. § 3553(a)(2)(A). With regard to the offense, Mr. Joseph undoubtedly committed an awful crime for which he should receive a sentence which includes a few years of incarceration. But, considering that Mr. Joseph was not a leader or organizer in the hostage taking and he played no role in the threatening negotiations, his sentence should not be too severe. Also, because he did not wish to injure anyone, Mr. Joseph did not cause any physical injury to the kidnaped boy or to the boy's father. When also considering Mr. Joseph's valuable substantial assistance to the government and his early acceptance of responsibility along with Mr. Joseph's lack of any criminal history and his unfortunate plight in Haiti, an eighty four months sentence is clearly warranted here. For these same reasons, a sentence of eighty four months is also consistent with promoting respect for the law and with providing just punishment for the offense. See 18 U.S.C. § 3553(a)(2)(A).

Based on all of the facts in this case, a sentence of eighty four months will provide ample

---

[10]With Mr. Joseph's requested departure of seven levels based on his substantial assistance, the defense is requesting a a total downward departure of nine levels in this case. A nine level departure places Mr. Joseph in a sentencing guideline range of 108-135 months.

deterrence for Mr. Joseph and anyone else who may consider committing a similar crime. See 18 U.S.C. § 3553(a)(2)(B). A sentence of eighty four months even after early acceptance of responsibility and cooperation sends a firm message that this sort of crime will be seriously punished despite the significant efforts one may make to remedy the effects of their harm. Considering that a sentence of eighty four months will remove Mr. Joseph from the community for a significant period of time, such a sentence is a serious sentence and such a sentence is certainly punitive enough to provide sufficient deterrence.

Mr. Joseph has never previously faced the type of incarceration he will serve in this case.[11] Therefore, after serving a sentence of eighty four months, Mr. Joseph will do everything in his power to avoid ever returning to jail. That includes, of course, never again engaging in criminal behavior. When he is ultimately released, Mr. Joseph wishes to enroll in educational classes (including classes which will teach him to read and write) and he hopes to receive a job in order to support his family. Because it is unlikely that Mr. Joseph will commit any further crimes and because of his responsible goals for the future, a sentence of eighty four months is more than necessary in order to serve the purpose of adequately protecting the community from any further crimes on the part of Mr. Joseph. 18 U.S.C. § 3553(a)(2)(C).

Finally, Mr. Joseph should receive a sentence which is substantially lower than the sentence imposed on Widmay Dorvilier in order to further the goal of avoiding unwarranted sentencing disparities. See 18 U.S.C. § 3553(a)(6). Mr. Dorvilier's background and his offense conduct warrant a sentence which is much greater than the sentence Mr. Joseph should receive. Mr. Dorvilier was the leader of a gang which committed various crimes which included hostage taking. Mr.

---

[11]In fact, it appears that Mr. Joseph has never previously been incarcerated.

Dorvilier was the leader and organizer of the instant offense and he was the person involved in the threatening negotiations. Mr. Dorvilier was involved in all of the planning meetings in relation to the instant offense and he was the person who recruited Mr. Joseph and others to participate in the offense. Mr. Dorvilier provided materials to others which would be used to further the offense, including at least two firearms. For these reasons, Mr. Joseph's sentence should be substantially less than Mr. Dorvlier's sentence and a sentence of eighty four months in Mr. Joseph's case is necessary in order to avoid unwarranted sentencing disparities.

     **D.**    **Conclusion**.

     For the reasons discussed above, any sentence more than eighty four months will be greater than necessary to satisfy the statutory purposes of sentencing. See 18 U.S.C. § 3553(a). A sentence of eighty four months is a just and fair sentence in this case. Therefore, a sentence of eighty four months is the most reasonable resolution of this matter.

                                       Respectfully submitted,
                                       A.J. Kramer
                                     Federal Public Defender

                                     _____/s/_____
                                     Tony W. Miles
                                     Assistant Federal Public Defenders
                                     625 Indiana Avenue, N.W.
                                     Washington, D.C. 20004
                                     (202) 208-7500